## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JEFFREY SPINDEL, on behalf of himself and all others similarly situated,<br><br>*Plaintiff*,<br><br>v.<br><br>ALDERFER FAMILY FARM LLC and ALDERFER POULTRY FARM, INC., 724 Harleysville Pike, Telford, PA 18969,<br><br><br>*Defendants*. | Case No. _23-10710_____<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

Plaintiff JEFFREY SPINDEL ("Plaintiff" or "Spindel"), a resident of Haverstraw, New York, individually and on behalf of others similarly situated, by and through his counsel, hereby files this Class Action Complaint for equitable relief and damages against Defendants ALDERFER FAMILY FARM LLC and ALDERFER POULTRY FARM, INC. (collectively, "Alderfer," "Defendants," or "the Company") and alleges the following based upon personal knowledge, information, and belief regarding the deceptive labeling, marketing, and sale of Defendants' egg products:

## **INTRODUCTION**

1.      This is a consumer protection case concerning deceptive marketing representations about shell eggs produced by Defendants Alderfer (the "Products"[1]).

---

[1] The Products include, but are not limited to, all non-organic Alderfer egg products.

1

2.      Alderfer is an egg company headquartered and incorporated in Pennsylvania.

3.      According to Alderfer, the Company sources its eggs from a "home farm" run by the Alderfer family and from partner farms located throughout Pennsylvania.[2] The partner farmers are under contract to provide eggs to Alderfer, which Alderfer then packages and sells throughout New York and the United States.[3]

4.      Alderfer knows that consumers seek out and wish to purchase eggs laid by hens who have ample space to roam and outdoor access. Alderfer knows that consumers will pay more for such eggs than they will for eggs laid by hens who do not have ample space to roam and outdoor access, or will buy more of such eggs than they will buy of eggs laid by hens who do not have ample space to roam and outdoor access.

5.      To capture this growing market of consumers who wish to purchase eggs from hens who have ample space to roam, the packaging on Alderfer's eggs states that the eggs are produced from "[c]age [f]ree," "Free Roaming" hens.

6.      These statements lead consumers to believe that Alderfer's eggs are laid by "Free Roaming" hens who have ample space to roam, which includes access to the outdoors and natural ground cover—*e.g.*, grass and dirt.

7.      Alderfer's "Free Roaming" claim is false, deceptive, and misleading. In fact, hens in Alderfer's supply chain are kept in densely packed barns and do not have meaningful access to the outdoors or natural ground cover. Hence, the hens do not have the ability to roam freely as understood by a reasonable consumer.

---

[2] *About Us*, Alderfer Eggs, https://alderfereggs.com/about-us/ (last visited Nov. 29, 2023); *FAQs,* Alderfer Eggs, https://alderfereggs.com/faqs/ (last visited Nov. 29, 2023).
[3] *Our Eggs*, Alderfer Eggs, https://alderfereggs.com/our-eggs/ (last visited Nov. 29, 2023).

8.     By deceiving consumers about the nature and quality of the Products, Alderfer is able to sell a greater volume of the Products, to charge higher prices for the Products, and to take away market share from competing products, thereby increasing its own sales and profit.

9.     Consumers lack the information and knowledge necessary to determine whether Alderfer's eggs are sourced from hens who have outdoor access and ample space to roam or to know or ascertain the true quality and sourcing of the Products.

10.    As a result of its false and misleading labeling and advertising, and omissions of fact, Alderfer was and is able to sell the Products to consumers in the State of New York and throughout the Northeastern United States and to realize sizeable profits.

11.    During any applicable statute of limitations period (the "Class Period"), Plaintiff and members of the Class (described below) saw Alderfer's "Free Roaming" misrepresentations when purchasing the Products. Plaintiff and members of the Class (described below) paid more for the Products than they otherwise would have paid, and/or purchased the Products, or purchased more of the Products, than they would have if they had known the truth about Alderfer's treatment of egg-laying hens. As a result, Plaintiff and Class Members suffered injury.

12.    Therefore, Alderfer's marketing representations that its eggs are laid by "Free Roaming" hens are false, deceptive, and misleading in violation of New York's General Business Law ("GBL") Sections 349 and 350.

13.    Because Alderfer's labeling and advertising of the Products tend to mislead and are materially deceptive about the true nature and quality of the Products, Plaintiff brings this deceptive advertising case on behalf of a proposed Class of consumers who purchased the Products in New York during the Class Period, and seeks relief including actual damages, interest, costs,

and reasonable attorneys' fees. Even today, members of the proposed Class are purchasing the misrepresented Products, and they will continue to do so unless Alderfer's conduct is stopped.

## JURISDICTION AND VENUE

14.     This Court has subject-matter jurisdiction over this proposed class action pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act ("CAFA"). There are at least 100 members in the proposed New York plaintiff class.

15.     Plaintiff is a citizen of New York. Plaintiff consents to this Court's jurisdiction over him by filing this complaint.

16.     The Court has personal jurisdiction over Alderfer because the claims herein arise from Alderfer transacting business in New York. Alderfer has purposefully directed its marketing practices to New York consumers, regularly conducts and transacts business in New York, distributes its Products throughout New York, and has availed itself of the benefits and protections of New York law, and it is therefore reasonable for Alderfer to anticipate being subject to an action in the courts of this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(a) and (b)(2) because substantial acts in furtherance of alleged improper conduct, including the dissemination of false and misleading labeling and advertising regarding the nature and quality of the Products at issue occurred within this District; and because Alderfer directs its marketing at consumers within New York, sells its eggs in New York, and has caused injury in New York.

## PARTIES

18.     Defendants Alderfer Family Farm LLC and Alderfer Poultry Farm, Inc. are Pennsylvania corporate entities with their shared principal place of business in Telford, PA.

19.     Collectively, Defendants process, market, and distribute shell eggs to be sold to consumers throughout New York and the Northeast and Mid-Atlantic United States, including New York, Maine, Maryland, Massachusetts, New Hampshire, New Jersey, New York, North Carolina, Pennsylvania, Rhode Island, Virginia, and Vermont. Defendants created and/or authorized the false and deceptive labeling of the Products.

20.     At all times mentioned herein, Plaintiff Spindel was and is an individual consumer over the age of 18. Within the Class Period, Plaintiff purchased Alderfer's Products labeled "Free Roaming," approximately monthly, on multiple occasions, from several retailers in the New York area, including the Orchards of Concklin Farmer's Market at 2 South Mountain Road, Pomona, NY 10970, and A Matter of Health at 138 Rockland Plaza, Nanuet, NY 10954.

21.     In deciding to make his purchases, like other consumers, Spindel saw, relied upon,[4] and reasonably believed Alderfer's "Free Roaming" representations.

22.     Spindel continues to purchase egg products and plans to continue purchasing egg products in the future.

23.      Members of the proposed class are currently purchasing, and will continue to purchase, Alderfer's Products, unaware that the "Free Roaming" representations are false.

## FACT ALLEGATIONS

I.     **Alderfer Falsely Represents That Its Eggs Are Laid by "Free Roaming" Hens.**

24.     Every Alderfer Product carton lid contains the phrase "Free Roaming" or "Free Roaming Hens."

---

[4] Reliance is not an element of New York General Business Law Sections 349 & 350.

25.     As explained below, reasonable consumers interpret these phrases to mean that the hens who laid the eggs have a significant amount of space and outdoor access, including access to natural ground cover.

26.     Many Alderfer eggs come from hens who have **no** access to the outdoors.

27.     As seen in the photos below of Alderfer facilities at 8838 State Route 44, Williamsport, PA, 17702, obtained through drone surveillance, other Alderfer eggs come from hens who have only minimal semi-outdoor access, namely a screened-in "porch" area that is too cramped to accommodate more than a small percentage of the hens at once.





28.     As seen in the above images, those Alderfer hens who have minimal access to the outdoors through access to the screened-in area porch are kept on mesh flooring and do not have any access to natural ground cover such as grass or dirt.

29.     Alderfer states on its website, "'Free-[R]oaming' refers to the fact that [its] hens are not in cages within the chicken house. [Its] hens are free to roam around inside the chicken house and produce what is called a '[c]age [f]ree' egg."[5]

30.     This information is intentionally omitted from Alderfer egg cartons in order to leave consumers who view only an Alderfer egg carton in the store, and not the website, unaware that the supposedly "Free Roaming" hens are actually kept inside.

31.     Alderfer hens, far from having room to roam, even when confined indoors, are densely packed into large barns.

---

[5] *Why Cage Free*, Alderfer Eggs, https://alderfereggs.com/our-eggs/why-cage-free/ (last visited Nov. 29, 2023).

32.    Inside these barns, the purportedly "Free Roaming" hens are allotted only 1.2-to-1.6 square feet of space per bird, according to Alderfer's website; this information is intentionally undisclosed on the cartons that consumers see in the store.[6]

33.    Alderfer's partner farmer Nevin Ehst reported to the Pennsylvania State Conservation Commission that he has two 24,472 square foot barns, each of which holds 20,000 hens at a time, which equates to each hen having only 1.22 square feet of space per bird.

34.    Alderfer's partner farmer Jeff Rohrer reported to the Pennsylvania State Conservation Commission that he has a 53,865 square foot barn for 40,000 laying hens, equating to only 1.35 square feet of space per bird.

35.    As can be seen in the photo below from Alderfer facilities, the hens are clustered tightly together and not free to "roam."



36.     Some Alderfer egg cartons also contain the word "natural," despite the fact that the hens who laid Alderfer eggs were raised in crowded barns with little to no outdoor access instead of in natural conditions, which would include foraging outside in the grass and dirt.

37.     All or most Alderfer egg cartons also contain language indicating that the hens who laid Alderfer eggs were fed a "vegetarian diet."

38.     Hens who have access to dirt or grass outdoors naturally forage for small animals like insects and worms to eat.

39.     Most consumers lack sufficient knowledge about chicken behavior to know that hens who have access to dirt or grass outdoors naturally forage for small animals to eat.

40.     If Alderfer hens have the opportunity to forage outside as consumers would expect from "Natural," "Free Roaming" chickens, then they cannot have truly vegetarian diets.

**II.     Alderfer's Representations Are Misleading to Consumers.**

41.     Contrary to Alderfer's representations on the labels of its eggs, the hens who lay Alderfer eggs are not "Free Roaming" as that term is understood by reasonable consumers.

42.     According to a 2023 Dynata survey, commissioned by Animal Outlook surveying East Coast consumers of shell eggs, reasonable consumers believe that the use of the term "Free Roaming" on the label of eggs means that the hens who laid the eggs have continual access to the outdoors and natural ground cover, such as grass, hay, or dirt.

43.     According to that same survey, 66% of consumers believe that eggs labeled "Free Roaming" are laid by hens who have continual access to the outdoors, and an additional 27% believe that eggs labeled "Free Roaming" are laid by hens who have access to the outdoors at least once a day.

44.     The 2023 Dynata survey also found that 70% of consumers believe that eggs labeled "Free Roaming" are laid by hens who have continual access to natural ground cover, such as grass or dirt, and an additional 24% of consumers believe that eggs labeled "Free Roaming" are laid by hens who have access to natural ground cover at least once a day.

45.     In the 2023 Dynata survey, when consumers were shown an image of the Alderfer egg carton with the "Free Roaming" claim in context and asked what "Free Roaming Hens" means, answers included, but were not limited to:

- "HENS CAN WALK AROUND OUTSIDE";

- "[T]he eggs were harvested from hens that are allowed to roam the farm";

- "[T]he hens are not boxed together in a [*sic*] overcrowded situation";

- "[The hens] are able to roam a large area and feed on natural habitat";

- "[The hens] are able to be outside and roam";

- "[The hens] are living and feeding in nature";

- "[The hens] can move about freely both indoors and outdoors";

- "[H]ens that are allowed to roam freely, having an expansive space to walk, roam freely on their own without restrictions";

- "[The hens] have access to fresh air and can roam anywhere they feel";

- "[The hens] are able to move about in an outdoor area for foraging purposes";

- "[The hens have] the ability to freely graze and roam in a wide open, natural area";

- "[T]he chickens can roam around outside and are not kept cooped up";

- "[H]ens are able to go freely wherever they want. They are able to graze out in a field of open space and [*sic*] not contained to just a hen house or small enclosure";

- "[C]hickens are outdoors and can be in a large unenclosed area. They are able to go and peck wherever they please outside";

- "[The hens have] access to a large farmland with feed and natural light, and not caged with artificial feeding methods and artificial light systems"; and

- "[The hens] are able to be out doors [*sic*] on the farm or homestead and gets [*sic*] lots of freedom and run around outside on the property."

46.    As described *supra*, paragraphs 27-28, some Alderfer hens have only minimal "outdoor access" via a screened-in porch.

47.    The 2023 Dynata survey found that, when shown the same images of Alderfer porches depicted *supra*, paragraphs 27-28, and asked "if egg-laying chickens had access to the structure shown, without any additional outdoor access, would you consider them to be 'Free Roaming' . . . why or why not?:" 82.3% of consumers did not consider chickens who have access to the porches to be "Free Roaming."[8]

48.    Alderfer intentionally sows confusion among consumers by using a 'Free Roaming' label, which reasonable consumers are likely to construe as equivalent to 'free-range,' a known standard. Alderfer knows and intends that consumers will confuse its "Free Roaming" claim with a "free-range" claim.

---

[8] *Online Survey of East Coast and D.C. Consumer Purchasers of Shell Egg Products* (on file with Counsel) (consumers noting on this open-ended question: "no, I think the farmer/factory farm is lying and using the term in bad faith[,] truth in advertising should mean exactly what it implies[,] this looks more like the [] factory farms we have"; "No. They are confined and on top of each other. They can't get to natural ground or have room to behave naturally"; "No. Not what I would call free roaming [sic]. [A]ny grower using Free Roaming to described [sic] an operation like the one pictured above is dishonest and clearly intends to mislead customers"; "No. That would be false advertisement. Free roaming means they have access to outdoors"; "The chickens here can see the outdoors but can't get outside to use it. They seem to have a very narrow run that is covered, not open. It seems to be metal and not allow the chickens access to grass and dirt.").

49.     The United States Department of Agriculture states that "Free Roaming" is synonymous with terms like "free-range," "pasture raised," and "meadow raised," and requires that the birds had continual outdoor access throughout their growing cycle in order for poultry products (*i.e.*, poultry meat products) to bear those labels.[9]

50.     As described above, many hens who lay eggs for Alderfer are packed by the thousands into barns with only 1.2-to-1.6 square feet of space per bird.

51.     The 2023 Dynata survey found that, when shown the same image of Alderfer chickens included *supra*, paragraph 35, and asked "would you consider these chickens to be 'Free Roaming' . . . why or why not?:" 83.9% of consumers stated that they did not consider those chickens to be "Free Roaming."[10]

52.     The 2023 Dynata survey also found that, for eggs labeled "Free Roaming," (1) 69% of consumers believe that the chickens who laid the eggs have enough space to move freely; (2) 57% of consumers believe that the chickens who laid the eggs are allocated more space than the size of a sheet of standard printer paper; (3) 70% believe the chickens who laid the eggs are not confined to an indoor barn for their entire lives; (4) 67% believe that the chickens who laid the eggs have enough space to express natural behaviors such as dust bathing, foraging, play, etc.; (5) 55% believe that all the chickens who laid the eggs can see and easily use a door to access the

---

[9] *Labeling Guideline on Documentation Needed to Substantiate Animal Raising Claims for Label Submissions*, U.S. Dep't of Agric. Food Safety & Inspection Serv., 4, 10-11 (2019), https://www.fsis.usda.gov/sites/default/files/media_file/2021-02/RaisingClaims.pdf.

[10] *Online Survey of East Coast and D.C. Consumer Purchasers of Shell Egg Products*, *supra* note 8 (consumers noting on this open-ended question: "as you can see they are all crowded together and there are too many chickens"; "I thought they would be outside"; "No. They are confined and barely have room to move"; "No this is not free roaming this is a bunch of chickens in horrible conditions stuffed into a small shack;" "NO. They are obviously all cramped together inside of a facility"; "No. They seem confined with extremely limited space. Moving 4 inches doesn't fit my definition of roaming"; and "These are definitely not free roaming chickens. They are overpopulated in an enclosed building and can barely move. This is not the humane way of treating chickens and should not be allowed.").

outdoors; and (6) 68% believe that the chickens who laid the eggs are treated more humanely than non-"Free-Roaming" chickens.

53.     The use of the term "natural" on some Alderfer egg cartons reinforces the idea that the hens who laid the Alderfer eggs had meaningful outdoor access.

54.     In the related context of chickens raised for meat, a 2015 national Consumer Reports survey found that 50% of United States consumers believe that poultry products labeled "natural" means that "the animals went outdoors."[11]

55.     The practices on Alderfer farms described *supra*, paragraphs 26–40, including allowing hens only minimal or no outdoor access and confining them densely indoors, do not meet a reasonable consumer's understanding of the term "Free Roaming," especially when combined with phrases like "cage free" or "natural."

### III.     Alderfer's Misrepresentations Are Material to Consumers.

56.     Alderfer's use of the term "Free Roaming" on its egg labels is misleading because Alderfer's actual practices do not match consumers' expectations of what this term means—*i.e.*, that the hens have space to roam unhindered and meaningful access to the outdoors and natural ground cover.

57.     Alderfer's use of the term "Free Roaming" on the labels of its eggs is material to consumers who care about supporting humane animal farming practices and/or believe that eggs from hens with space to roam and outdoor access are of better quality.

58.     These consumers are willing to, and do, pay more for eggs that come from hens whose care and treatment meet their understanding of "Free Roaming."

---

[11] *Natural Food Labels Survey: 2015 Nationally Representative Phone Survey*, Consumer Reports National Research Center, 4 (2015), https://www.foodpolitics.com/wp-content/uploads/Consumer-Reports-Natural-Food-Labels-Survey-Report.pdf.

59.     The 2023 Dynata survey of East Coast consumers found that when purchasing eggs, approximately 58% of consumers consider whether the chickens who laid the eggs are "cage free," 41% of consumers consider whether the chickens who laid the eggs have access to the outdoors, and 30% of consumers consider whether the chickens who laid the eggs have ample space to express natural behaviors.

60.     The 2015 national survey published by Consumer Reports found that 84% of consumers say "providing better living conditions for animals" is a key objective when shopping for food.[12]

61.     Additionally, a 2022 national survey of grocery shoppers found that 68% of shoppers who had purchased eggs labeled "free-range," a term easily equated with "Free Roaming," did so because they thought it indicated improved animal welfare.[13] Further, 57% of purchasers reported that they paid more for eggs labeled "free-range" because "they believed [the] label indicated higher-welfare production practices."[14]

62.     The same survey found that 70% of shoppers who purchased eggs labeled "natural" did so "because they believed [the] label indicated higher-welfare production practices," and that 65% of consumers paid more for eggs so labeled "because they believed [the] label indicated higher-welfare production practices."[15]

63.     The lack of outdoor access can lead to increased stress and reduced activity in hens.[16] In contrast, hens who do enjoy outdoor access suffer less feather damage and footpad

---

[12] *Id.* at 3.
[13] Melissa Thibault et al., *Why Are They Buying It?: United States Consumers' Intentions When Purchasing Meat, Eggs, and Dairy with Welfare-Related Labels*, 7 Food Ethics 1, 12 (2022) https://link.springer.com/article/10.1007/s41055-022-00105-3.
[14] *Id.*
[15] *Id.*
[16] Rubi Sanchez-Casanova et al., *Effects of Outdoor Access and Indoor Stocking Density on Behaviour and Stress in Broilers in the Subhumid Tropics*, 9 Animals 1016, 1016 (2019),

dermatitis, and have a better digestive and gut function than that of hens kept indoors. Hens who

spend more than five hours per day outdoors have better plumage, fewer comb wounds, shorter

nail length, and higher spleen and gizzard weight—all positive indicators for animal welfare.[17]

64.     A recent survey by the Organic Trade Association found that the presence of "free-

range," an analogous animal-raising claim, on a label makes 55% of consumers more likely to

purchase the product, while an "all natural" label influences 60% of consumers.[18]

65.     Another study found that a majority of consumers surveyed were willing to pay an

average of $0.16-$0.25 more per dozen eggs if the hens who laid them had outdoor access.[19]

66.     Consumers are willing to pay more for free-range eggs because they believe

producing eggs this way confers benefits to themselves, as well as to the hens who laid the eggs.

67.     Because Alderfer's "Free Roaming" claims, which Alderfer knows consumers will

confuse with analogous "free-range" claims, influence reasonable consumers to buy Alderfer eggs,

buy more Alderfer eggs, or spend more on Alderfer's eggs, despite the fact that its actual hen-

raising practices do not meet a reasonable consumer's perceptions of what "Free Roaming" means,

Alderfer's representations are material and misleading.

68.     Alderfer's conduct in labeling and advertising the Products with the claim "Free

Roaming" deceived and/or was likely to deceive the public. Consumers have been, and continue

to be, deceived into believing that the eggs are laid by hens who have ample space to roam and

---

https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6940855/pdf/animals-09-01016.pdf; *see* H. Blokhuis et al., *Farm Animal Welfare Research in Interaction with Society*, 22 Veterinary Q. 217, 219-21 (2000), https://pubmed.ncbi.nlm.nih.gov/11087134/.

[17] Md Saiful Bari et al., *Effects of Outdoor Ranging on External and Internal Health Parameters for Hens from Different Rearing Enrichments*, 8 PeerJ e8720 1, 2-3, 10-11 (2020), https://peerj.com/articles/8720/.

[18] *See* Kathryn Poppiti, *Organic Trade Association Share Summary of Survey Results*, Organic Matters 6, 23 (Summer 2022), https://paorganic.org/wp-content/uploads/2022/08/OM_summer_22_WEB_2MB_v2.pdf.

[19] *See* Yan Heng et al., *Consumer Attitudes Toward Farm-Animal Welfare: The Case of Laying Hens*, 38 J. of Agric. & Res. Econ. 418, 429 (2013).

outdoor access, when in fact the eggs are laid by hens who do not have ample space to roam, and in some cases, never have outdoor access.

69.     Consumers cannot discover the true nature of the Products from reading the label or Alderfer's advertising materials. Ordinary consumers do not have sufficient knowledge about the egg industry to learn how Alderfer's egg-laying hens are raised.

70.     Alderfer deceptively and misleadingly conceals material facts about the Products, namely, that the Products are sourced from egg-laying hens who do not have ample space to roam, that the hens do not have ample space to express natural behaviors, that many of the hens are confined to barns for the entirety of their lives and will never see the outdoors, and that, even if some of the hens do have "outdoor access," such access is limited to a small, screened-in porch, which does not provide access to natural ground cover.

71.     Alderfer knew what representations it made on the labels and advertising of the Products. It also knew how the Products were sourced and produced. Alderfer thus knew, or should have known, the facts demonstrating that the Products were falsely advertised.

72.     To this day, Alderfer continues to conceal the true nature, identity, sources, and methods of production of the Products.

73.     Alderfer's concealment tolls the statute of limitations.

74.     In making the false, misleading, and deceptive representations and omissions at issue, Alderfer also knew and intended that consumers would choose to buy, and would pay more for, products promoted with the claim "Free Roaming," furthering Alderfer's private interest in increasing sales of its products and decreasing the sales of its competitors' products that are truthfully marketed.

75.     Had Alderfer not made the false, misleading, and deceptive representations and omissions at issue, Plaintiff and the class members would not have been willing to pay the same amount for the Products they purchased, would have chosen competing products, and/or would not have purchased as much of the Products.

76.     Alderfer's ongoing false and misleading labeling and advertising of the Products continues to cause harm to Plaintiff and the consumers he seeks to represent.

77.     Consumers are at risk of real, immediate, and continuing harm if the Products continue to be sold using false and misleading labeling and advertising.

## CLASS ALLEGATIONS

78.     Plaintiff realleges and incorporates by reference the allegations set forth in each of the preceding paragraphs of this Complaint.

79.     This action is maintainable as a class action under Rules 23(b)(2) and (3) of the Federal Rules of Civil Procedure.

80.     The class definition(s) may depend on the information obtained throughout discovery. Notwithstanding, at this time, Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all consumers who purchased Alderfer's Products (as defined herein) within the State of New York during the Class Period (the "Class").

81.     Excluded from the Class are (1) Defendants, any entity or division in which a Defendant has a controlling interest, and their legal representatives, officers, directors, assigns, and successors; and (2) the judge to whom this case is assigned and the judge's staff.

82.     Plaintiff brings the Class pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), 23(b)(2), and 23(b)(3).

83.     Plaintiff reserves the right to amend the Class definitions if further information and discovery indicate that the Class definitions should be narrowed, expanded, or otherwise modified.

84.     All members of the Class were and are similarly affected by the deceptive labeling and advertising of Alderfer's Products, and the relief sought herein is for the benefit of Plaintiff and members of the Class.

**I.     Numerosity**

85.     At this time, Plaintiff does not know the exact number of the Class members. Based on the wide distribution of Alderfer's Products, Plaintiff believes that the Class comprises many thousands of consumers. The number of consumers in the Class is so large as to make joinder impracticable, if not impossible. Class members may be notified of the pendency of this action by recognized, court-approved notice dissemination methods, which may include U.S. Mail, electronic mail, Internet postings, and/or published notice.

**II.     Commonality**

86.      There is a well-defined community of interest in the questions of law and fact in this case. Questions of law and fact common to the members of the Class that predominate over questions that may affect individual class members include:

a.     Whether Defendants are responsible for the labeling and advertising at issue;

b.     Whether the labeling and advertising of the Products was unfair, false, deceptive, fraudulent, and/or unlawful;

c.     Whether the labeling and advertising of the Products is likely to mislead a reasonable consumer;

d.     What reasonable consumers understand a "Free Roaming" claim to convey about the treatment of the hens who laid the Alderfer eggs; and

e.   Whether Alderfer's conduct, as set forth above, injured Plaintiff and Class members.

## III.   Typicality

87.   Plaintiff's claims are typical of those of the Class, as the claims arise from the same course of conduct by Defendants, and the relief sought within the Class is common to all the Class members. Plaintiff, like all Class members, relied[20] on Defendants' false and misleading representations and purchased Alderfer's Products, or purchased more of them, or paid more for the Products than he would have paid if the Products had been properly labeled, and sustained injury from Alderfer's wrongful conduct. Further, there are no defenses available to Defendants that are unique to Plaintiff.

## IV.   Adequacy

88.   Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff is an adequate representative of the Class because his interests do not conflict with the interests of the Class members he seeks to represent, and he has retained counsel competent and experienced in both consumer protection and class action litigation. Plaintiff and his counsel will fairly and adequately protect the interests of the members of the Class. Undersigned counsel have represented consumers in a variety of actions seeking to protect consumers from fraudulent and deceptive practices.

## V.   Predominance and Superiority of Class Action

89.   The prerequisites to maintaining a class action pursuant to Federal Rule of Civil Procedure 23(b)(3) are met because questions of law and fact common to each Class member

---

[20] Reliance is not an element of New York General Business Law Sections 349 & 350.

predominate over any questions affecting only individual members, and a class action is superior to other available methods for fairly and efficiently adjudicating this controversy.

90.     Individual joinder of the Class members is not practicable, and questions of law and fact common to the Class predominate over any questions affecting only individual Class members. Each Class member has been damaged and is entitled to recovery as a result of the violations alleged herein.

91.     Moreover, because the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation would make it difficult or impossible for individual Class members to redress the wrongs done to them, while an important public interest will be served by addressing the matter as a class action. Class action treatment will allow those persons similarly situated to litigate their claims in a manner that is most efficient and economical for the parties and the judicial system.

92.     Plaintiff is unaware of any difficulties in managing this case that would preclude proceeding as a class action.

93.     Certification also is appropriate under Rule 23(b)(2) because Defendants acted, or refused to act, on grounds generally applicable to the Class.

94.     Further, given the large number of consumers of Alderfer's Products, allowing individual actions to proceed in lieu of a class action would run the risk of yielding inconsistent and conflicting adjudications.

## CAUSES OF ACTION

## COUNT I

**Violation of New York General Business Law Section 349
(On Behalf of Plaintiff and All Class Members)**

95.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

96.     The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

97.     Alderfer has marketed the Products with the phrase "Free Roaming" when, in fact, hens in Alderfer's supply chain are kept in densely packed barns and do not all have meaningful access to the outdoors or natural ground cover.

98.     Alderfer has violated, and continues to violate, Section 349 of the New York General Business Law, which makes deceptive acts and practices unlawful. As a direct and proximate cause of Alderfer's violation of Section 349, Plaintiff and other members of the Class have suffered damages in an amount to be determined at trial.

99.     Alderfer's improper consumer-oriented conduct is misleading in a material way in that it, *inter alia*, induced Plaintiff and the Class members to purchase and to pay the requested price of the Products when they otherwise would not have, or would not have purchased as much.

100.     Alderfer knew what representations it made on the labels and advertising of the Products. It also knew how the Products were sourced and produced. Alderfer thus knew, or should have known, the facts demonstrating that the Products were falsely advertised.

101.     Defendants thus made the misleading statements and representations willfully, wantonly, and with reckless disregard for the truth.

21

102.    Plaintiff and the Class members have been injured by their purchase of the Products, which were worth less than what they bargained and/or paid for, and which they selected over other products that may have been truthfully marketed.

103.    Alderfer's advertising and the Products' packaging and labeling induced Plaintiff and the Class members to buy the Products, to buy more of the Products, and/or to pay the price requested for those Products.

104.    As a direct and proximate cause of Alderfer's violation of Section 349, Plaintiff and other members of the Class paid for falsely advertised Products, and, as such, have suffered damages in an amount to be determined at trial.

105.    Therefore, Alderfer is liable to Plaintiff and the other members of the Class for actual damages or fifty dollars ($50) for each purchase of an Alderfer Product (whichever is greater), attorneys' fees, and the costs of this suit. The Court may, in its discretion, increase the award of damages to an amount up to three times the actual damages, up to $1000, based on Alderfer's willful and knowing violation of Section 349.

106.    In addition, Alderfer continues engaging in the deceptive conduct, and, upon information and belief, will continue to do so. Members of the Class that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented Products.

107.    The unfair and deceptive acts and practices of Alderfer, as described above, present an ongoing threat to Plaintiff and the other members of the Class.

## COUNT II

**Violation of the New York General Business Law Section 350**
**(On Behalf of Plaintiff and All Class Members)**

108.    Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

22

109.   The acts of Defendants, as described above, and each of them, constitute unlawful, deceptive, and fraudulent business acts and practices.

110.   New York General Business Law Section 350 provides: "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state is hereby declared unlawful."

111.   GBL Section 350-a defines "false advertising," in relevant part, as "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect."

112.   Plaintiff and the members of the Class are consumers who purchased Alderfer's Products in the State of New York.

113.   As a seller of goods to the consuming public, Alderfer is engaged in the conduct of business, trade, or commerce within the meaning of GBL Section 350.

114.   Alderfer's representations made by statement, word, design, device, sound, or any combination thereof, and also the extent to which Alderfer's advertising fails to reveal material facts with respect to its Products, as described above, constitute false advertising in violation of the New York General Business Law.

115.   Alderfer's false advertising was knowing and intentional.

116.   Alderfer's actions led to direct, foreseeable, and proximate injury to Plaintiff and members of the Class.

117.   As a consequence of Alderfer's deceptive marketing scheme, Plaintiff and the other members of the Class suffered an ascertainable loss, insofar as they would not have purchased the Products had they known the truth, would not have paid the price requested for the Products, and/or would have purchased fewer of the Products; moreover, as a result of Alderfer's conduct, Plaintiff and the other members of the Class received Products of less value than what they paid for.

23

118.    By reason of the foregoing, Alderfer is liable to Plaintiff and the other members of the Class for actual damages or five hundred dollars ($500) for each sale of a Product (whichever is greater), attorneys' fees, and the costs of this suit. The Court may, in its discretion, increase the award of damages to an amount up to three times the actual damages, up to $10,000, based on Alderfer's willful and knowing violation of GBL Section 350.

119.    In addition, Alderfer continues engaging in the deceptive conduct, and, upon information and belief, will continue to do so. Members of the Class that Plaintiff seeks to represent are purchasing, and will continue to purchase, the misrepresented Products.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully prays for judgment on behalf of himself and the proposed Class against Alderfer and requests that the Court provide such relief as follows:

(a) Certification of the Class proposed herein under Federal Rule of Civil Procedure 23(a), (b)(1), (b)(2), and (b)(3); appointment of Plaintiff Jeffrey Spindel as representative of the Class and appointment of his undersigned counsel as counsel for the Class;

(b) A declaration that Alderfer is financially responsible for notifying members of the Class of the pendency of this suit;

(c) An order requiring an accounting for, and imposition of, a constructive trust upon all monies received by Alderfer as a result of the unfair, misleading, fraudulent, and unlawful conduct alleged herein;

(d) Restitution, disgorgement, refund, and/or other monetary damages, including treble damages, together with costs and disbursements, including reasonable attorneys' fees and expert fees, and prejudgment interest at the maximum rate allowable by law;

(e) Statutory or actual damages pursuant to New York General Business Law Sections 349 and 350, and treble damages pursuant to Section 349;

(f) Punitive damages in accordance with proof and in an amount consistent with applicable precedent; and

(g) Such other and further relief as the Court may deem just and proper.

Dated: December 8, 2023                    Respectfully submitted,

*/s/ Kim E. Richman*
Kim E. Richman
Brooke Dekolf
**Richman Law and Policy**
1 Bridge Street, Suite 83
Irvington, NY 10533
Tel: (914) 693-2018
krichman@richmanlawpolicy.com
bdekolf@richmanlawpolicy.com


*/s/Piper Hoffman*
**Animal Outlook**
Piper Hoffman
P.O. Box 9773
Washington, DC 20016
Tel: (347) 201-0177
legal@animaloutlook.org